Entered on Docket October 20, 2014

**Below is the Order of the Court.**

*Paul B. Snyder*
_____
**Paul B. Snyder**
**U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

---

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF WASHINGTON AT TACOMA**

| | |
|---|---|
| In re:<br><br>TAMI DUHAMAL MITCHELL,<br><br>                  Debtor. | **Case No. 09-44678** |
| TAMI DUHAMAL MITCHELL,<br><br>                  Plaintiff,<br><br>v.<br><br>V-A LOAN ACQUISITION TRUST; MRU HOLDINGS, INC.; MRU LENDING INC.; MRU LOANS (MRU Student Loan Trust 2007-A Asset Backed Securities); PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY (aka PHEAA); and AMERICAN EDUCATION SERVICES, LLC, a division of PHEAA Pennsylvania Higher Education Assistance Agency,<br><br>                  Defendants. | **Adversary No. 13-04415**<br><br>**MEMORANDUM DECISION**<br><br>**(Not for Publication)** |

      Trial in this matter was held before the Court on September 24, 2014, on the complaint of Tami Mitchell (Debtor) against V-A Loan Acquisition Trust (Defendant) to determine whether her student loan debt is dischargeable pursuant to 11 U.S.C. § 523(a)(8).[1]  The Court took the

---
[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM DECISION - 1

matter under advisement. Based on the evidence, arguments of counsel, and pleadings submitted, the Court makes the following findings of fact and conclusions of law.

The Debtor was the recipient of five student loans used to fund her college education: a Parent PLUS Loan in her mother's name; a Federal Student Aid (FSA) loan; two loans from the National Collegiate Trust serviced by American Education Services, LLC; and the Defendant's loan. On September 2, 2005, the Debtor executed a promissory note (Note), borrowing $16,000 from Doral Bank, NY, FSB. The Note was subsequently transferred to the Defendant, which is the current beneficial holder of the Note. On the date this adversary proceeding was commenced, October 22, 2013, the Debtor owed $17,620.25 on the Note. The Debtor attended college at Eastern Washington University sporadically from January 2004 to June 2008. She eventually earned her Bachelor of Art's degree in English in December 2013.

The 32-year-old Debtor testified that she has experienced severe anxiety and depression since she was a child. These conditions worsened as she grew older. When she was approximately 17 years old, her depression was so severe that she did not get out of bed for a year, which led to her suspension from high school. The Debtor testified that she became suicidal and was intermittently hospitalized. Eventually she was able to finish high school when she was 21 years of age. She was the first member of her family to obtain a high school diploma.

The Debtor testified that despite her symptoms, she enjoyed learning and wanted the same things as other people: education, children and success. In 2004, the Debtor decided to attend college and applied for student loans to pursue her post-secondary education. The Debtor testified she received no family assistance; accordingly, she needed the student loans to attend. The Debtor's testimony was extremely credible. The Debtor in those early college years believed she could be cured, always intending to repay the loans. She testified, however, that in 2006, she realized she had a debilitating condition and in the future would be

MEMORANDUM DECISION - 2

unable to lead a normal life. At that point, she ceased applying for student loans. She testified that she began receiving Social Security Disability benefits in 2006 due to her diagnosed bipolar and personality disorder. The Debtor continues to receive these benefits.

It took the Debtor ten years to complete her college education. In addition to student loans, she financed college through grants. During this time, the Debtor sought medical treatment, and she requested and received accommodations from the colleges due to her disability. She testified that she also took light course loads and worked only part time. Nonetheless, the Debtor repeatedly experienced both extreme manic episodes and periods of severe depression. She was forced to leave college many times and intermittently moved home with her parents. The Debtor testified that she was, and remains, socially isolated with few close friends. She was repeatedly terminated from many unskilled job positions for being incapable of performing the required work and for poor attendance.

In November 2005, the Debtor made her first student loan payment to the Defendant in the amount of $141.26. In 2006, the Debtor obtained a forbearance or deferment, and then made an additional five payments. The Debtor sought an additional forbearance or deferment but was denied because she had used the maximum time available. The Debtor made a total of 15 payments on the Defendant's loan, with her last payment made on August 1, 2008. She also made payments on several of her other student loans. When the Debtor began to acknowledge to herself the extent of her disability, she realized that her cumulative student loan payments were too high for her realistically to pay. The Debtor filed a chapter 7 bankruptcy on June 30, 2009.

The Debtor testified that her FSA loan was discharged by the United States Department of Education on July 31, 2009, due to the Debtor's total and permanent disability. The two National Collegiate Trust loans were discharged in the bankruptcy on October 18, 2010, through a Consent Judgment entered in a different adversary proceeding. The Debtor testified

MEMORANDUM DECISION - 3

that she was told by her attorney and believed the Defendant's student loan also was discharged in that adversary proceeding. Therefore she no longer made payments on the loan or made efforts to renegotiate it. The Debtor started receiving bills from the Defendant some three years later. She was advised by her attorney not to begin payments at first since the loan debt was discharged, and subsequently because she believed she was clearly disabled as recognized by the Social Security Administration and the other student loan note holders. The Debtor commenced the current adversary proceeding in 2013 when she was advised by her attorney that the Defendant's student loan had not been previously discharged.

The Debtor currently receives Social Security Disability payments in the amount of $837 per month. The Debtor testified that since January 2009, she has worked part time as a guest services associate at PetSmart, caring for dogs and cats. PetSmart receives federal tax credits for employing her. The Debtor earns $10.23 an hour, working 4-16 hours per week. Her work hours vary depending on the Debtor's health and the employer's needs, as the Debtor testified that her position is considered nonessential and her employer is very accommodating of her due to her disability. The Debtor's average monthly income over the six months prior to the trial was $493.76. PetSmart accommodates the Debtor by, among other things, allowing her to take breaks because of her ongoing anxiety. The Debtor testified that when her emotions are out of control, she calls a family member or squeezes her "Emotional Support Animal," which is an eight-year-old Labrador the employer permits her to bring to work.

The Debtor testified that she has never tried to obtain permanent office work due to her personality disorder and lack of skills. She also testified that she can type only a little because of the pain and numbness she experiences in her hands. She wears braces for carpal tunnel syndrome.

To supplement her income, the Debtor has done intermittent at-home dog boarding through DogVacay.com. The Debtor's six month average earnings from this are $336.23. The

MEMORANDUM DECISION - 4

Debtor testified that she can no longer market to board dogs in her approximately 525-square-foot home, however, because the dogs aggravate her asthma and allergies.

The Debtor testified that she has also performed odds-and-ends work to earn extra income in order to survive. She previously cleaned houses, but she can no longer scrub due to the weakness in her hands. The Debtor also has sold many of her belongings and has tried flipping items from thrift stores to earn additional income. At times the Debtor runs errands for others for a fee. Taking into consideration all of these different sources of income, the Debtor earns an average of $1,598.92 a month.

The Debtor testified that she tries to keep her overall monthly expenses the same as her income by purchasing less food when her income drops. The Debtor dehydrates and cans food; has a vegetable garden and receives fruit from her friends' fruit trees; only purchases meat that is 50% off; and buys her bread from the discount store. To save money on housekeeping expenses, the Debtor testified that she makes her own household cleaning products. Her food and housekeeping expense is $190.20 a month.

The Debtor's monthly expense for her clothing and personal care is $33. The Debtor testified that she buys 90% of her clothes from the Good Will, and purchases the rest with coupons or on clearance. She testified that she washes her hair with vinegar and baking soda, and re-uses toiletries.

The Debtor drives a 2009 Chevrolet, which was purchased after her prior vehicle was involved in an automobile accident in 2013. She pays $177.13 monthly on the car loan, and owes a balance of $7,684.40. The Debtor testified that this is her sole source of transportation and she is unable to ride a bike to reduce her travel expenses.

Although the Debtor is over the age of 26, she remains a dependent on her mother's medical insurance due to her ongoing disability. The Debtor testified that she is able to remain on her mother's medical insurance indefinitely due to her disability status as long as her mother

does not drop her from the policy. In return, the Debtor pays $119.29 per month on her Parent PLUS Loan for which her mother is responsible. The balance on this loan is reportedly $6,729.39. While the Debtor is covered by Medicare, this does not cover the extensive medical treatment she needs for her health conditions. The Debtor testified that if she was not on her mother's medical insurance, Medicare would become her primary insurance, and she would have to pay Medigap, which she estimated to be significantly more than the monthly payment on the Parent PLUS Loan. The Debtor pays $105 per month for prescriptions, supplements and co-pays on medical bills.

The Debtor's monthly house payment is $373.70, which includes her real property tax liability. The tax liability is reduced because of the Debtor's disability status. The Debtor testified that she afforded the purchase of her approximately 525-square-foot home only with the assistance of a Pierce County Community Development Corporation and a federal grant. She testified that she found it less expensive to own her home than rent due to the grants. The house is valued at $71,700, but on sale she has no equity. The Debtor testified, however, she has been advised that the electrical and plumbing must be significantly repaired in order just to make the house minimally safe. When she purchased the house, she believed she would receive a grant for these repairs, but did not qualify because of the substantial amount needed to bring her home up to code requirements. Based on estimates she has received, the Debtor believes she will need $9,000-$10,000 to make the necessary electrical repairs. The cost to repair the plumbing is unknown since the Debtor could not afford a contractor's estimate.

The Debtor also pays the following monthly expenses: $50.42 per for pet insurance for her Emotional Support Animal; $35 for pet expenses; $81.33 for vehicle insurance; $25 on a $1,191.45 balance for physical therapy; $57 for a credit card with a balance of $2,075.35; $4.58 for a joint Costco membership; $45 for home maintenance; and a total of $177.27 for utilities and phone. The Debtor testified that she removed over 50% of the light bulbs in her

MEMORANDUM DECISION - 6

home to reduce her utility costs. Additionally, she does not pay for garbage, but instead composts and takes her garbage to her work and friends' homes.

The Debtor admitted to spending $320 on gambling last year. She testified that she becomes manic once or twice a year, which results in compulsive behavior.

The Debtor testified that she was advised she would receive a settlement of $8,000-$10,000 from a personal injury case after deducting attorney's fees. She would like to use this money to make her house safer by repairing at least the electrical and plumbing problems. She has been advised her home is not safe as it is.

The Debtor has no savings or retirement. She receives negligible financial support from her family. While her father testified that he provides emotional support to his daughter through daily contact, the Debtor's mother is not as understanding and creates emotional problems for her daughter. The Debtor testified that her mother is "unbearable" and puts too much stress on her. For this reason, both the Debtor and her father testified that she cannot live with her parents. According to her father's testimony, the Debtor has substantial mood swings if she is in a pressure situation. He testified she maintains a minimal lifestyle and is on anti-anxiety medication.

The sole witnesses during the trial were the Debtor and her father, whose testimony the Court found also both compelling and credible. During the trial, the Debtor was visibly upset while testifying. It was necessary to take numerous breaks during her testimony to allow the Debtor to compose herself, despite the presence of the Debtor's Emotional Support Animal.

The Debtor seeks to discharge her student loan debt owed to the Defendant. The parties do not dispute the existence of the Defendant's loan or that it falls under § 523(a)(8). Accordingly, the Debtor has the burden of establishing an "undue hardship" by proving all three Brunner factors to obtain a discharge of her student loans. See United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1111-12 (9th Cir. 1998); Brunner v. New York State

MEMORANDUM DECISION - 7

Higher Educ. Servs. Corp. (In re Brunner), 831 F.2d 395 (2nd Cir. 1987). If a debtor fails to meet its burden as to any one of these elements, the inquiry ends with a finding that the student loan debt is not dischargeable. Rifino v. United States (In re Rifino), 245 F.3d 1083, 1087-88 (9th Cir. 2001).

Under the first Brunner prong, the Debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living" if she is required to pay back the Defendant's loan. Brunner, 831 F.2d at 396. A debtor must show more than simply "tight finances." United Student Aid Funds, Inc. v. Nascimento (In re Nascimento), 241 B.R. 440, 445 (9th Cir. BAP 1999). "In defining undue hardship, courts require more than temporary financial adversity, but typically stop short of utter hopelessness." Nascimento, 241 B.R. at 445. The court should inquire "whether it would be 'unconscionable' to require the Debtor to take steps to earn more income or reduce her expenses." Nascimento, 241 B.R. at 445.

The Debtor receives Social Security Disability payments in the amount of $837 per month because of her diagnosed bipolar and personality disorder. The record establishes that this medical condition has interfered with her ability to obtain skilled employment or maintain a full-time position. Yet with the accommodation of her employer PetSmart, the Debtor has been able to work at least 4 hours and up to 16 hours a week in an unskilled, nonessential position since 2009. Furthermore, the Debtor has repeatedly attempted to increase her income by boarding dogs, running errands for cash, cleaning houses, and selling personal property. The Debtor's additional medical problems, like carpal tunnel and allergies, however, have reduced the income earned through these different pursuits. Even so, the Debtor's income averages $1,598.92 a month.

The record before the Court, including the credible testimony of the Debtor and her father, establishes that the Debtor has gone to extraordinary measures to minimize her expenses so that they do not exceed her income. These measures include, but are not limited

MEMORANDUM DECISION - 8

to, growing and canning her own food; purchasing only meat that is 50% off; composting and disposing of her garbage elsewhere; re-using certain toiletries; making her own cleaning products; washing her hair with vinegar and baking soda; purchasing 90% of her clothing at the Good Will; and removing 50% of the light bulbs in her home to reduce her utility bill. The Debtor also has a minimal house payment of $373.70, for a home only 525 square feet in size, which testimony establishes needs major repairs in order to be regarded as safe. The Debtor's father testified that the Debtor is very thrifty. Based on the Debtor's income and expenses, the Debtor does not have disposable income to make payments on the Defendant's loan.

The Defendant takes issue with the Debtor's monthly payment of $119.29 for the Parent PLUS Loan in the name of the Debtor's mother. The Defendant contends there is no legal basis for the Debtor to make this payment, particularly at the expense of the Defendant's loan. Yet the Debtor testified that before her mother took out this loan, it was understood the Debtor would make the payments. Furthermore, she testified that if she does not make these loan payments, her mother will drop her from, and no longer fund, her medical insurance. It is uncontested that the Debtor and her mother have a strained relationship that contributes to the Debtor's stress and anxiety. The only evidence presented establishes that if she was no longer on her mother's medical insurance, the Debtor would incur an additional monthly medical expense that would exceed the payment she makes for the student loan taken out by her mother on the Debtor's behalf. Accordingly, eliminating the current arrangement whereby the Debtor pays the Parent PLUS Loan and her mother pays for her medical insurance, would not result in additional funds available to pay on the Defendant's loan.

The Court concludes that based on the Debtor's diagnosed bipolar and personality disorder, the Debtor has done everything within her ability to maximize her income and minimize her expenses in order to exist at a minimal standard of living. The Court viewed first hand during the trial the impact her medical condition has on the Debtor's ability to function.

MEMORANDUM DECISION - 9

Despite the presence of her Emotional Support Animal and frequent breaks during the trial, the Debtor was severely anxious and distressed while testifying. The extent of the Debtor's emotional suffering witnessed by the Court is unprecedented in this Court's many years on the bench. The Court further finds that the stressful relationship between the Debtor and her mother precludes the Debtor from living in her parents' home. Finally, the Court acknowledges that the Debtor's attorney represented the Debtor pro bono in this adversary proceeding, which is further support of the Debtor's inability to afford any additional expenses. Accordingly, the Court concludes that if the Debtor had to make payments on the Defendant's loan, she would not be able to maintain her current standard of living, which under the best of conditions is minimal.

Under the second Brunner prong, the Debtor must establish "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan[]." Brunner, 831 F.2d at 396. The burden is on the debtor to provide the court with additional circumstances, "i.e., 'circumstances, beyond the mere current inability to pay, that show the inability to pay is likely to persist for a significant portion of the repayment period. The circumstances need be 'exceptional' only in the sense that they demonstrate insurmountable barriers to the debtors' financial recovery and ability to pay.'" Educ. Credit Mgmt. Corp. v. Nys (In re Nys), 446 F.3d 938, 946 (9th Cir. 2006) (quoting In re Nys, 308 B.R. 436, 444 (9th Cir. BAP 2004)). "[T]he determinative question is whether the debtor's inability to pay will, given all we know about the salient features of her existence, persist throughout a substantial portion of the loan's repayment period." Nys, 446 F.3d at 946.

The credible testimony of the Debtor establishes that the 32-year-old Debtor has been plagued by severe anxiety and depression most of her life. It is undisputed that the Social Security Administration began paying the Debtor disability benefits in 2006 based on her diagnosed bipolar and personality disorder. The Debtor continues to receive these benefits.

MEMORANDUM DECISION - 10

The uncontested evidence also is that the Debtor continues to experience mood swings and depression, which can cause her to completely shut down. Additionally, the Debtor is on anti-anxiety medication.

Regarding her employment opportunities, the Debtor testified that she has been unable to maintain a full-time job because of the stress it causes. She also has been unable to work at an office job due her lack of skills and the pain and numbness in her hands. While the Debtor has been employed part time by PetSmart since 2009, she testified that her employer's needs and her disability permit her to work only 4-16 hours a week. Additionally, her employer makes accommodations for the Debtor's disability, such as allowing an Emotional Support Animal on the job and breaks when the Debtor is feeling overly emotional or stressed.

There is no evidence to suggest that the Debtor's life-long medical disability will not continue into the future or that she will be able to obtain employment that will markedly increase her income. As such, based on the record before the Court, the Debtor has established that her inability to pay the Defendant's student loan will likely persist throughout a substantial portion of the loan's repayment period.

For the final Brunner prong, the Debtor must establish that she "has made good faith efforts to repay the loan[]." Brunner, 831 F.2d at 396. To determine good faith, the court measures the debtor's efforts to obtain employment, maximize income, minimize expenses, and negotiate a repayment plan. Educ. Credit Mgmt. Corp. v. Mason (In re Mason), 464 F.3d 878, 884 (9th Cir. 2006). The failure to negotiate or accept an alternative repayment plan is not dispositive of this Brunner prong. Mason, 464 F.3d at 884. The good faith obligation continues after the debtor files an adversary proceeding pursuant to § 523(a)(8). Roth v. Educ. Credit Mgmt. Corp. (In re Roth), 490 B.R. 908, 917 (9th Cir. BAP 2013). A bankruptcy court's good faith finding is reviewed for clear error. Hedlund v. Educ. Res. Inst. Inc. (In re Hedlund), 718 B.R. 848, 854 (9th Cir. 2013).

MEMORANDUM DECISION - 11

The Debtor made 15 payments to the Defendant during a two-year period. She stopped making payments only upon acknowledging that due to the extent of her disability, she was unable to earn enough money to pay the cumulative payments on her multiple student loans. Furthermore, she did not attempt to make additional payments or negotiate a payment plan with the Defendant because both she and her attorney believed the student loan debt was discharged due to her disability. This belief is consistent with the determinations of the other student loan note holders that the Debtor was disabled. Moreover, the Court already concluded that in spite of her life-long disability, the Debtor has made every effort to maximize her income and minimize her expenses. Even so, the Debtor is barely able to maintain a minimal standard of living.

The Defendant contends, however, that the Debtor's anticipated receipt of a personal injury settlement in an unknown amount, but estimated to be between $8,000 and $10,000, is evidence that she has not made a good faith effort to repay the student loan. The Debtor testified that she would like to use these funds to rewire her house in order to make it safe. Additionally, her home has persistent plumbing problems. The evidence establishes that while the Debtor intended to use grants to repair the electrical problems, the extent of the work that needs to be completed precluded her from receiving any grants. According to the Debtor, if there are any personal injury funds remaining after completing the electrical and plumbing repairs, the Debtor will put these funds toward the Defendant's student loan debt.

The Court was unable to locate, and neither party provided, case law holding that a debtor's use of a lump-sum payment for something other than student loan debt per se negates good faith under the Brunner test. Rather, this appears to be a case-by-case inquiry. See Tucker v. Sallie Mae, Inc. (In re Tucker), 2009 WL 2877906, at *7-8 (Bankr. D. N.H. Sept. 3, 2009) (finding that the debtor's use of a $14,000 lump-sum payment to repay those who loaned her money to pay basic living expenses, rather than pay her student loan debt, did not prevent

MEMORANDUM DECISION - 12

a finding of good faith); <u>Waters v. Educ. Credit Mgmt. Corp. (In re Waters)</u>, 2007 WL 419538, at *7 (Bankr. D. Vt. Feb. 3, 2007) (finding that debtor's choices in spending lump-sum payments on things other than her student loan debt did not support a finding of good faith). Additionally, courts have defined "minimal standard of living" to include a vehicle to go to work, stores and the doctor, and have found that applying a lump-sum payment to such an item does not preclude a finding of good faith. <u>Marcotte v. Brazos Higher Educ. Servs. Corp. (In re Marcotte)</u>, 455 B.R. 460, 473 n.20 (Bankr. D. S.C. 2011) (citing <u>Pena</u>, 155 F.3d at 1114 (where Ninth Circuit Court of Appeals held that the debtors satisfied the good-faith prong even though they received a post-petition lump-sum payment for past-due disability and used it to purchase an approximately 20-year-old car and pay other bills rather than pay the student loan debt)).

The Court concludes that like a vehicle, a minimally safe residence is included within the definition of "minimal standard of living." The uncontested evidence is that it will cost between $9,000 and $10,000 to make the electrical repairs necessary to render the Debtor's house minimally safe. What is needed to bring the home's plumbing to a safe condition is unknown. To the extent the Debtor uses the personal injury settlement funds to make these repairs, the Court finds that using these funds in this manner rather than putting them toward the Defendant's student loan debt does not negate a finding of good faith. At the same time, however, the Court finds that to the extent the personal injury funds exceed the cost of the electrical and plumbing repairs, these funds must be paid to the Defendant on the student loan debt, as proposed by the Debtor. Accordingly, when viewing the evidence consistent with this decision, the Debtor has made a good faith effort to repay the Defendant's student loan.

Having satisfied the first two <u>Brunner</u> factors, and contingently satisfied the third factor, the Debtor has established that excepting the Defendant's student loan debt from discharge would impose an undue hardship except to the extent she has funds from the personal injury settlement that exceed the cost of repairing her home's electrical and plumbing problems. In

MEMORANDUM DECISION - 13

that instance, only that portion of the student loan debt not paid for by the excess personal injury settlement funds will be nondischargeable. See Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman), 325 F.3d 1168, 1173-75 (9th Cir. 2003) (holding that bankruptcy courts may exercise their equitable authority under § 105(a) to partially discharge student loans as long as the discharged portion satisfies the requirements under § 523(a)(8)). The attorneys for the Debtor and the Defendant shall (1) develop a procedure to monitor the Debtor's receipt of the settlement proceeds and payment of the electrical and plumbing repairs, and (2) notify the Court when funds, if any, are available to pay toward the Defendant's loan, or otherwise inform the Court that no funds are available.

///End of Memorandum Decision///

MEMORANDUM DECISION - 14